# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

DAVID JOHNSON,                       )
                           )      3:11-cv-00487-HDM-VPC
        Plaintiff,        )
                           )
    v.                         )      **REPORT AND RECOMMENDATION**
                           )      **OF U.S. MAGISTRATE JUDGE**
STATE OF NEVADA *ex rel.* BOARD      )
OF PRISON COMMISSIONERS, *et al.,*   )
                           )
        Defendants.       )      July 10, 2013
_____)

       This Report and Recommendation is made to the Honorable Howard D. McKibben, United States District Judge.  The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and LR IB 1-4.  Before the court is plaintiff's motion for summary judgment (#60) and defendants' cross-motion for summary judgment (#66).[1]  Defendants opposed plaintiff's motion for summary judgment (#75) and plaintiff replied (#96).  Plaintiff opposed defendants' cross-motion for summary judgment (#86) and defendants replied (#92).  The court has thoroughly reviewed the record and recommends that plaintiff's motion for summary judgment (#60) be denied, and defendants' cross-motion for summary judgment (#66) be granted.

## I.  HISTORY & PROCEDURAL BACKGROUND

       Plaintiff David Johnson ("plaintiff"), a *pro se* inmate, is currently incarcerated at Lovelock Correctional Center ("LCC") in the custody of the Nevada Department of Corrections ("NDOC") (#14).  Plaintiff brings his civil rights complaint pursuant to 42 U.S.C. § 1983, alleging that defendants violated his First Amendment right to freely exercise his religion, his statutory rights

---

[1] Refers to the court's docket numbers.

under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), his Fourteenth Amendment right to equal protection, and his religious rights under the Nevada Constitution.[2]  *Id.* The court screened the complaint pursuant to 28 U.S.C. § 1915A, and permitted plaintiff's First Amendment free exercise claim, RLUIPA claim, and Fourteenth Amendment equal protection claim to proceed (#13, p. 7).   The remaining defendants in this litigation are Brian Sandoval, in his capacity as a commissioner on the Board of State Prison Commissioners ("BPC"); Ross Miller, a commissioner on the BPC; Catherine Cortez Masto, a commissioner on the BPC; James Cox, NDOC Director; Don Helling, former NDOC Deputy Director; Robert LeGrand, Warden of LCC; Tara Carpenter, former Associate Warden of LCC; Bruce Harkreader, Correctional Case Work Specialist II at LCC; Jim Gibbons, former member of the BPC; and Howard Skolnik, former NDOC Director (#66, pp. 1-2).   Plaintiff sues all defendants in both their individual and official capacities for damages, declaratory relief and injunctive relief (#14, pp. 2-4, 32-33).

Plaintiff alleges that NDOC has not officially recognized his Orthodox Christian faith group, the effect of which denies plaintiff a religious dietary accommodation, in the form of a kosher meat diet, and a reasonable opportunity to congregate for corporate prayer (#86, p. 2).   Plaintiff alleges that defendants' failure to accommodate his religious dietary and corporate prayer requests violate his First Amendment right to freely exercise his religion, his statutory rights under RLUIPA, and his Fourteenth Amendment right to equal protection.

On November 20, 2009, plaintiff submitted a Faith Group Affiliation Declaration, identifying himself as a member of the Orthodox Christian faith group (#66-36, p. 1).   At that time, NDOC did

---

[2] Article 1 of the Nevada Constitution concerns the free exercise of religion, and is a corollary to the First Amendment to the United States Constitution.  *See Jacobs v. Clark County Sch. Dist.*, 373 F.Supp.2d 1162, 1170 n.1 (D.Nev. 2005). Thus, the court analyzes plaintiff's religious rights claims arising under the Nevada Constitution and the United States Constitution under the same standard.

not include Orthodox Christianity on its list of recognized religions (#14, p. 7).[3]  On December 11, 2009, plaintiff submitted a Request for Accommodation of Religious Practices (DOC 3505), asking NDOC's Religious Review Team ("RRT") to officially recognize his Orthodox Christian faith group (#66-36, pp. 2-6).

*Kosher Diet*:

NDOC's Administrative Regulation ("AR") 810, effective July 8, 2008, governs religious faith group activities and programs.  AR 810 provides that NDOC institutions will take reasonable steps to meet the needs of religious faith groups, such as diets, holy days, study groups, and special services and ceremonies.[4]  AR 814, effective November 15, 2004, governs NDOC's kosher diet policy.[5]  AR 814 provides that an inmate may receive a religious dietary accommodation if the inmate establishes "his suitability for a religious diet through a hereditary or social connection to the religious practice, or substantial philosophical understanding of the religion and its dietary practices" (#75-3, p. 9).

LCC's Operational Procedure ("OP") 810, effective May 2009, governs LCC's kosher diet policy.  OP 810.19(2)(A) states that LCC will provide a kosher diet to verified conservative or orthodox Jewish inmates (#75-4, p. 10).  If an inmate wishes to receive a kosher diet, he must have a faith group declaration on file stating that he is Jewish, submit a kite to LCC's Chaplain requesting kosher meals, and provide the contact information for an appropriate outside organization which can verify that the inmate is either a conservative or orthodox Jew.  *Id.*  If the inmate meets these

---

[3] Plaintiff alleges that prior to NDOC's Administrative Regulation ("AR") 810's revision on July 8, 2008, NDOC included Orthodox Christianity on its list of recognized religions (#14, p. 13).  The court notes that the current version of AR 810.2, effective August 1, 2011, also does not include Orthodox Christianity on its list of recognized religions (NDOC AR 810.2, found at http://www.doc.nv.gov/sites/doc/files/pdf/ar/AR810.2.pdf).

[4] NDOC AR 810 is found at http://www.doc.nv.gov/sites/doc/files/pdf/ar/AR810.pdf, p. 2.

[5] AR 814 was revised on June 17, 2012.  However, the 2004 version is applicable to this suit.

requirements, he will appear before the appropriate LCC officials to complete the LCC Kosher Meals Tracking Form, and will begin the process of receiving kosher meals.[6] *Id.*

On January 27, 2010, plaintiff submitted an inmate kite requesting certain dietary restrictions (no eggs or dairy products) for the upcoming Lenten fast (#66-36, p. 7). Plaintiff was informed that the culinary offered "meatless Fridays" for anyone signing up for Lent, but that specific dietary requests would not be accommodated. *Id.* On April 15, 2010, April 21, 2010, May 17, 2010, May 27, 2010 and August 9, 2010, plaintiff submitted inmate kites requesting a kosher diet. *Id.* at 28-29, 32-33, 54. LCC Chaplain Richard Garcia responded to plaintiff's requests and informed him that the only inmates who were approved to receive kosher meals were Orthodox or Conservative Jews who could provide proof of Jewish ethnicity or a formal conversion process from a recognized Jewish organization. *Id.*

On June 14, 2010, plaintiff submitted Grievance Log No. 2006-28-99827, complaining that NDOC's failure to recognize his Orthodox Christian faith group violated his religious rights, and that NDOC's kosher diet policy was discriminatory (#66-36, pp. 15-22).[7] On June 23, 2010, defendant Harkreader responded to plaintiff's informal grievance, stating:

> I have spoken with Chaplain Garcia regarding your grievance. As you have been informed, you may practice any religion that you wish, but only the ones recognized by the Department may order items particular to their religious beliefs. Orthodox Christian is not recognized by the Department and [the Department] has no obligation to provide special diets or authorize religious items for its practice.

*Id.* at 16. Thereafter, plaintiff exhausted Grievance Log No. 2006-28-99827, which was denied at all levels. *Id.* at 11-14.

---

[6] Defendants admit that OP 810.19 should be revised to accord with AR 814, and state that the appropriate NDOC authorities are in the process of revising OP 810 (#75, p. 19, n. 42). However, defendants do not cite any authority for this assertion.

[7] Plaintiff alleges that defendant Helling approved plaintiff's DOC 3505 request on August 5, 2010 (#14, p. 10). However, this evidence is not in the record before the court.

On August 18, 2010, plaintiff submitted Grievance Log No. 2006-29-03717, complaining that LCC's OP 810 violated his religious rights (#66-36, pp. 45-51).  Plaintiff explained that Orthodox Christian practitioners adhere to a kosher diet, and argued that OP 810's kosher meal restrictions were race-based and discriminatory.  *Id.* at 48-49.  On September 1, 2010, defendant Harkreader responded to plaintiff's informal grievance, stating, "This is the exact same issue as you filed in GR-2006-28-99827."  *Id.* at 46.  Thereafter, plaintiff exhausted Grievance Log No. 2006-29-03717, which was denied at all levels.  *Id.* at 35-46.

By January 27, 2010, plaintiff was receiving NDOC's alternative meatless diet, although the record is unclear as to the exact date plaintiff began to receive this diet (#66-1, p. 48; #66-36, p. 26). On October 14, 2012, plaintiff asked to be removed from the alternative meatless diet, and he was placed back on the mainline-menu diet (#75-2, p. 4; 75-2, ¶ 12).  Plaintiff states that he asked to switch back to the mainline-menu diet because inmates on the alternative meatless diet eat next-to-last out of the three housing units, which leaves little fresh fruit for these inmates (#96, p. 21). Plaintiff also states that he purchases his own oatmeal for breakfast, and that he purchases bread, jelly and peanut butter for lunch, which allows plaintiff to trade his non-kosher meat for fresh fruit and vegetables.  *Id.*

NDOC Chaplain James Stogner states that Orthodox Christians do not have a special dietary standard; however, an adherent may observe a "meatless" diet from Great Lent through Easter, and on Wednesdays and Fridays throughout the calendar year (#66-33, ¶ 31).  Chaplain Stogner states that the tenets of Orthodox Christianity do not require its adherents or practitioners to observe a kosher diet or kosher meat diet.  *Id.* at ¶ 34.  While an Orthodox Christian practitioner may prefer to observe a kosher diet or kosher meat diet for personal reasons, consuming non-kosher food does not violate the religious tenets of Orthodox Christianity.  *Id.* at ¶ 37.  Thus, Chaplain Stogner opines that

NDOC's refusal to provide an Orthodox Christian inmate with a kosher diet or kosher meat diet does not prohibit the free exercise of that inmate's Orthodox Christian beliefs or substantially deprive that inmate of his religious exercise. *Id.* at ¶ 38.[8]

Chaplain Stogner also states that while NDOC's Religious Review Team ("RRT") has recommended that Orthodox Christianity be added to NDOC's list of recognized faith groups, the RRT has not recommended a kosher diet or kosher meat diet for these practitioners. *Id.* at ¶ 72. Instead, the RRT has recommended a meatless diet from Great Lent through Easter, as well as all Wednesdays and Fridays throughout the calendar year. *Id.*

LCC Warden Robert LeGrand states that in May 2010, NDOC's religious diet policy limited the provision of kosher meals to Orthodox or Conservative Jews who could prove either Jewish ethnicity or participation in a formal conversion process (#66-35, ¶ 10). Since that time, NDOC has revised its policy to include other faith groups. *Id.* By March 2012, NDOC permitted inmates to receive a kosher diet if their sincere religious dietary needs could not be met by the mainline-menu diet without prohibiting the free exercise of their religion or substantially burdening their religious exercise. *Id.*

Warden LeGrand states that from an institutional perspective, providing kosher meals to inmates who do not require kosher meals creates problems. *Id.* at ¶ 11. For example, inmates might hide the sealed kosher food containers on their persons, and transport these containers back to their cells. *Id.* This could promote subsequent inmate-bartering of kosher food, which is prohibited for safety and security reasons. This could also promote subsequent improper food storage, which implicates health issues. *Id.* Further, inmate-envy issues might arise, in which one inmate is

---

[8] Chaplain Stogner states that consuming meat from an animal that has had its blood drained is a religious tenet rooted in Orthodox Christianity and is parallel to one component of Kosher law. However, requiring meat to be kosher is not rooted in Orthodox Christianity. *Id.* at ¶ 55.

perceived to have something unfairly that another inmate cannot have.  This could lead to an increased risk of hostility, violence and threats upon those inmates or staff.  *Id.*  Finally, the prison has scarce economic resources, and kosher meals are much more expensive than mainline-menu meals.  *Id.*

NDOC's Chief of Purchasing and Inmate Services, Dawn A. Rosenberg, states that NDOC inmates may choose between the mainline-menu diet, which is a regular diet that contains non-kosher meat products (including beef, chicken and fish), and the alternative meatless diet, which does not contain beef or chicken products (#75-1, ¶¶ 7, 9).  Certain inmates may also qualify for a kosher diet (for religious reasons) or a medical diet (as prescribed by a doctor).  *Id.* at 2, n.1.  In March 2012, NDOC's "Current Kosher Menu" ("CKM") was phased out upon implementation of the "Common-Fare/Religious Diet Menu" ("CFM") (#66-34, ¶ 2).

In Fiscal Year 2012, NDOC's budget for providing non-kosher, mainline meals was approximately $2.43 per inmate, per day.  *Id.* at ¶ 7.  In Fiscal Year 2012, NDOC's food cost for providing kosher meals under the CKM was approximately $16.35 per inmate, per day, per two-week-cycle-cost average.  *Id.* at ¶ 8.  From calendar year 2009 to calendar year 2012, the ratio of the cost difference between providing the mainline-menu meals to providing the CKM meals has been approximately the same—with the CKM meals costing six to seven times more than the non-kosher, mainline meals.  *Id.* at ¶ 9.  Currently, the food cost of providing kosher meals to NDOC inmates under the CFM is approximately $8.76 per inmate, per day, per two-week-cycle-cost average.  *Id.* at ¶ 10.

*Corporate Prayer:*

OP 810.01 provides that all inmates will have access to religious programs, limited by custody levels and security concerns (#75-4, p. 4). OP 810.01 also provides that religious scheduling and resources will be allocated in proportion to inmate population needs. *Id.*

> On August 1, 2010, plaintiff submitted an inmate kite to Chaplain Garcia, which stated: It is the practice of the Orthodox Christian Church and its members to pray seven times a day. These are done corporately in services held at the specified times for the specific office. Whereas we now have enough Orthodox Christians in P.S. we are requesting a place and times for accommodating this practice. These services and times (excluding midnight for security reasons) are as follows: Daily Matins, followed by the 1st Hour—6 a.m., the 3rd Hour—9 a.m., the 6th Hour—12 noon, the 9th Hour—3 p.m., Vespers—6 p.m. (or before evening meal), Small Compline—9 p.m. or before bed, Midnight office.

(#66-36, p. 78). Chaplain Garcia responded to plaintiff's kite, stating:

> Thank you, Mr. Johnson. I staffed this request with Warden Carpenter. Considering the necessity to pray seven times a day versus penological interests and security, you are free to pray in your cell, as setting aside a place other than a cell for six to seven meetings a day is unfeasible here in this prison environment.

*Id.* On August 10, 2010, plaintiff submitted an inmate kite to defendant Carpenter, asking her to articulate what "penological interests" and "security concerns" warranted "placing not merely a substantial burden, but an outright prohibition on the free exercise of [plaintiff's Orthodox Christian corporate prayer]?" *Id.* at 79. Defendant Carpenter informed plaintiff that she would review his request at the next religious meeting. *Id.* On August 25, 2010, plaintiff submitted a second inmate kite to defendant Carpenter, once again asking her to state "penological interests" and "security concerns." *Id.* at 80. Defendant Carpenter informed plaintiff that his request had been discussed at the religious meeting, and had been denied due to limited staffing, supervision and space. *Id.* On August 31, 2010, plaintiff submitted a third inmate kite to defendant Carpenter, informing her that the seven hours of liturgical prayer "does not equate to 420 minutes it is more properly 7 times per day." *Id.* at 81. Plaintiff argued that his DOC 3505 request had been approved, and that he believed

Orthodox Christian corporate prayer could be held in the activity rooms without staff supervision. *Id.* Defendant Carpenter responded:

> An RRT was submitted for your religion to be recognized by AR 810. Which it has not yet been approved. They are adding it eventually.

*Id.*

On September 8, 2010, plaintiff submitted Grievance Log No. 2006-29-04879, complaining that Chaplain Garcia and defendant Carpenter discriminatorily denied his request for "the seven liturgical hours of prayer as required by the Orthodox religion" (#66-36, p. 67). On October 26, 2010, plaintiff submitted a first level grievance pursuant to AR 740, as prison officials failed to respond to plaintiff's informal grievance within the specified time limits. *Id.* at 60-61. Defendant Carpenter rejected plaintiff's informal level grievance and first level grievance on the grounds these grievances were duplicative of Grievance Log No. 2006-28-99827. *Id.* at 58-59. On November 14, 2010, plaintiff filed a second level grievance, explaining that Grievance Log No. 2006-29-04879 concerned plaintiff's request for "corporate liturgical prayer." *Id.* at 55-57. Defendant Helling rejected plaintiff's second level grievance. *Id.* at 56.

Chaplain Stogner states that Orthodox Christians practice both personal worship and group worship (known as corporate prayer); however, there is no customary expectation that group worship will occur in excess of once per week and on special holy days (#66-33, ¶ 20). For laity (non-monks, non-clergy and non-members of monastic orders), observing group worship on a daily basis is not a requirement, tenant or custom of the Orthodox Christian religion. *Id.* at ¶ 21. Chaplain Stogner opines that although an Orthodox Christian practitioner may prefer to pursue group worship each day during the seven liturgical hours of prayer, this preference is not required by the Orthodox Christian religion. *Id.* at ¶ 24. Chaplain Stogner also opines that even though an inmate may claim he is required to participate in group worship each day during the seven liturgical hours of prayer,

such prayer can be accomplished through personal worship. *Id.* at ¶ 22. Thus, Chaplain Stogner contends that NDOC's refusal to accommodate an inmate's request for corporate prayer seven times per day does not prohibit the free exercise of that inmate's Orthodox Christian religion or substantially deprive that inmate of his religious exercise. *Id.* at ¶ 23.

Chaplain Stogner states that he expects NDOC to add Orthodox Christianity to AR 810's Faith Group Overview chart when the regulation is next published, and that the RRT has recommended including a weekly Orthodox Christian group worship service—subject to scheduling approval. *Id.* at ¶¶ 57, 72. In the meantime, Chaplain Stogner opines that the mere fact that NDOC does not officially recognize the Orthodox Christian faith group does not substantially burden plaintiff's religious exercise because the practice of Orthodox Christianity can be subsumed under the larger grouping of "Christian." *Id.* at ¶ 58. As an example, Chaplain Stogner points out that NDOC does not officially recognize the United Methodist Church, the Southern Baptist Church or the Assembly of God. *Id.* at ¶ 59. However, inmate adherents of these particular faith groups may declare their religious affiliation as "Christian" and then participate in whatever personal religious devotions and group religious services they may choose. *Id.*

Chaplain Stogner also states that any inmate may ask the chaplain to include additional religious services in the Chapel schedule, as approval is not conditioned on whether NDOC officially recognizes the particular religion on its Faith Group Overview chart. *Id.* at ¶ 61. Plaintiff could have (and still may) request an Orthodox Christian religious service to be included in the Chapel schedule. *Id.* Further, simply because a particular faith group is included on NDOC's Faith Group Overview chart does not guarantee that a group worship service will be scheduled for that particular religion at any given institution. *Id.* at ¶ 62. Group worship services are scheduled based on inmate participation and available space. *Id.* at ¶ 63. As a general rule, a group worship service

may be scheduled when there are at least three interested inmate participants. *Id.* Because Chapel space is limited, scheduling preference is given to those faith groups with the greatest number of inmate participants. *Id.* Thus, scheduling is based on a secular consideration (maximizing utility for the greatest number of inmates)—not a religious consideration (favoring one religion over another). *Id.* Further, regardless of faith group, inmates may keep religious observances in their cells, request one-on-one clergy visits (subject to clergy availability), obtain approved religious print materials, and borrow the books and materials in the Chapel library. *Id.* at ¶¶ 68-70.

Depending on institutional requirements, NDOC staff or an approved religious volunteer may be required to supervise inmate worship services. *Id.* at ¶ 65. Many institutions also manage several inmate populations—such as general population, protective segregation, administrative segregation, disciplinary segregation and various infirmary and mental health units—which are generally not permitted to co-mingle for safety, security and custody reasons. *Id.* at ¶ 66. Accordingly, available facilities must be managed in such a manner as to permit access to all inmate groups. *Id.* at ¶ 67.

Warden LeGrand states that from an institutional perspective, providing plaintiff with the means to attend group worship services multiple times per day would undermine prison safety, security, discipline and order (#66-35, ¶ 14). He also states that this accommodation would waste scarce economic resources, including the staff allocation. *Id.* LCC's designated religious area is the prison chapel. *Id.* at ¶ 19. Housing Unit 3B's activity room is currently used for numerous purposes throughout the day, including educational classes, college classes, self-help courses (C-base, tutoring, AA/NA, STOP), barber shop and the laundry pass-out area. *Id.* at ¶ 25. If LCC permitted plaintiff's religious group to use the Unit 3B activity room multiple times per day (plaintiff requests forty-nine times per week), then LCC would be forced to cease using this area for other scheduled activities, which would affect many other inmates. *Id.* at ¶¶ 26-27. In addition, if LCC permitted

plaintiff's religious group to use the activity room to hold group prayer meetings, then LCC would also have to allow all other religious groups to use the activity room.  *Id.* at ¶ 28.  This would significantly reduce education, mental health services and other services in the protective segregation ("PS") unit,[9] which could create inmate resentment and could increase the risk of harm to inmates and staff.  *Id.* at 29.  Accordingly, Warden LeGrand opines that it would be unacceptable to permit a small group of inmates to interrupt the scheduled use of the activity room forty-nine times per week.  *Id.*  Further, due to LCC's reduced staffing levels in the evening hours, there are many nights where there is no floor-officer in the PS unit.  *Id.* at ¶ 30.  Thus, accommodating plaintiff's request for group prayer in the evening would require prison administrators to pull staff from other critical areas or to hire overtime staff to safely supervise these activities.  *Id.* at ¶ 31.

Defendants move for summary judgment on six grounds: (1) defendants did not violate plaintiff's First Amendment right to freely exercise his religion by refusing to accommodate plaintiff's requests for a kosher diet and corporate prayer (#66, p. 2, n. 3, 22-24, 26, n. 46; #75, pp. 7-8, 20, n. 44); (2) defendants did not violate plaintiff's statutory rights under RLUIPA by refusing to accommodate plaintiff's requests for a kosher diet and corporate prayer (#66, pp. 26-27); (3) defendants did not violate plaintiff's Fourteenth Amendment right to equal protection by refusing to accommodate plaintiff's requests for a kosher diet and corporate prayer (#66, pp. 20, 24-25); (4) defendants are entitled to qualified immunity (#66, p. 30; #75, p. 29); (5) the BPC defendants' (Gibbons, Sandoval, Miller and Cortez Masto) indirect involvement is insufficient to state a claim under 42 U.S.C. § 1983 (#66, p. 19); and (6) defendants personal participation cannot be predicated

---

[9] There are approximately 1650 inmates incarcerated at LCC.  Within this population there are approximately 322 inmates housed in the PS units.  *Id.* at ¶¶ 15-16.  Plaintiff is a "close custody" inmate housed in PS Unit 3B, due to confidential safety concerns.  *Id.* at ¶ 18.  Due to security concerns dealing with the protection of PS inmates, LCC provides inmate services to PS inmates as one group, and to general population ("GP") inmates as another group.  *Id.* at ¶ 21.

on the denial of a grievance because inmates have no "legitimate claim of entitlement to a grievance procedure." *Id.* at 20.

Plaintiff also moves for summary judgment and contends that: (1) NDOC's AR 810 effectively requires approval of plaintiff's faith group before NDOC will allow plaintiff to practice his religion (#60, p. 19); (2) plaintiff's requests for a kosher meat diet and participation in corporate prayer are sincerely held religious beliefs mandated by the Orthodox Christian religion (#60-1, pp. 1-2; #86, pp. 3, 7-9, 31); (3) defendants' refusal to recognize plaintiff's faith group substantially burdens his religious exercise (#60, p. 19); and (4) plaintiff's Orthodox Christian faith group is similarly situated to other religious groups, and plaintiff was denied equal protection of the law based on his race and religion (#60, p. 22; #86, p. 18; #96, p. 17).

As a preliminary matter, the court notes that plaintiff is proceeding *pro se*.  "In civil cases where the plaintiff appears *pro se*, the court must construe the pleadings liberally and must afford plaintiff the benefit of any doubt."  *Karim-Panahi v. Los Angeles Police Dep't*, 839 F.2d 621, 623 (9th Cir. 1988); *see also Haines v. Kerner*, 404 U.S. 519, 520-21 (1972).

## II.  DISCUSSION & ANALYSIS

### A.    Legal Standards

#### 1.  42 U.S.C. § 1983

Title 42 U.S.C. § 1983 "provides a federal cause of action against any person who, acting under color of state law, deprives another of his federal rights."  *Conn v. Gabbert,* 526 U.S. 286, 290 (1999).  Section 1983 does not offer any substantive rights, but provides procedural protections for federal rights granted elsewhere.  *Albright v. Oliver,* 510 U.S. 266, 271 (1994).  To prove liability under § 1983, a plaintiff must: (1) show that a person acting under color of state law engaged in some type of conduct, which (2) deprived the plaintiff of some right, privilege or immunity secured

by the Constitution or federal statutory law.  *Parratt v. Taylor*, 451 U.S. 527, 535 (1981), *overturned on other grounds by Daniels v. Williams*, 474 U.S. 327 (1986).

### 2.  Summary Judgment Standard

Summary judgment allows courts to avoid unnecessary trials where there are no factual disputes.  *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994).  The court will grant summary judgment if no genuine issues of material fact remain in dispute and the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c).  The court must view all evidence and any inferences arising from the evidence in the light most favorable to the nonmoving party.  *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996).  However, the Supreme Court has noted:

> [W]e must distinguish between evidence of disputed facts and disputed matters of professional judgment.  In respect to the latter, our inferences must accord deference to the views of prison authorities.  Unless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage.

*Beard v. Banks*, 548 U.S. 521, 530 (2006) (internal citations omitted).  Where reasonable minds could differ on the material facts at issue, however, summary judgment should not be granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986).

The moving party bears the burden of informing the court of the basis for its motion, and submitting authenticated evidence to demonstrate the absence of any genuine issue of material fact for trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see Orr v. Bank of America*, 285 F.3d 764, 773-74 (9th Cir. 2002).  Once the moving party has met its burden, the party opposing the motion may not rest upon mere allegations or denials in the pleadings, but must set forth specific facts showing the existence of a genuine issue for trial.  *Anderson*, 477 U.S. at 248.  Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery, against a party who

fails to make a showing sufficient to establish the existence of an element essential to that party's case, and upon which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322-23.

On summary judgment the court is not to weigh the evidence or determine the truth of the matters asserted, but must only determine whether there is a genuine issue of material fact that must be resolved by trial. *See Summers v. A. Teichert & Son, Inc.*, 127 F.3d 1150, 1152 (9th Cir. 1997). Nonetheless, in order for any factual dispute to be genuine, there must be enough doubt for a reasonable trier of fact to find for the plaintiff in order to defeat a defendant's summary judgment motion. *See Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).

**B.   Analysis**

**1.   First Amendment Free Exercise Clause**

Convicted prisoners do not lose their First Amendment right to freely exercise their religion by virtue of their incarceration. *Cruz v. Beto*, 405 U.S. 319, 322 n.2 (1972). However, "lawful incarceration brings about the necessary withdrawl or limitation of many privileges and rights . . .." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987) (quoting *Price v. Johnston*, 334 U.S. 266, 285 (1948)). A prisoner's right to freely exercise his or her religion is necessarily limited by incarceration, and may be curtailed to achieve legitimate correctional goals or to maintain prison security. *McElyea v. Babbitt*, 833 F.2d 196, 197 (9th Cir. 1987) (per curiam).

To merit protection under the Free Exercise Clause, a prisoner's religious claim must satisfy two basic criteria. *Callahan v. Woods*, 658 F.2d 679, 683 (9th Cir. 1981). First, the prisoner's proffered belief must be "sincerely held." *Id.* Second, the claim must be "rooted in religious belief"—not in "purely secular" philosophical concerns. *Id; see Shakur v. Schriro*, 514 F.3d 878, 885 (9th Cir. 2008) (sincerity test set forth in *Malik v. Brown*, 16 F.3d 330, 333 (9th Cir. 1994), and *Callahan*, 658 F.2d at 683, determines the applicability of the Free Exercise Clause). In *Shakur*, the

Ninth Circuit made clear that "'[i]t is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds.'"  514 F.3d at 884 (quoting *Hernandez v. C.I.R.*, 490 U.S. 680, 699 (1989)).  Instead, the inquiry is "whether the [prisoner's] beliefs . . . are sincerely held and whether they are, in this own scheme of things, religious."  *United States v. Seeger*, 380 U.S. 163, 185 (1965); *Shakur*, 514 F.3d at 885 (inquiry is whether plaintiff sincerely believes eating kosher meat is consistent with his faith).  Determining if a prisoner's claim is "rooted in religious belief" requires analyzing whether the prisoner's claim is related to his sincerely held religious belief.  *Malik*, 16 F.3d at 333 (citation omitted).

Even if a prison regulation impinges on an inmate's constitutional rights, the regulation is nevertheless valid if it is reasonably related to legitimate penological interests.  *Shakur*, 514 F.3d at 883-84 (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)).  Under *Turner*, the court must balance four factors to determine whether a prison regulation is reasonably related to legitimate penological interests: (1) whether there is a "valid, rational connection" between the prison regulation and the legitimate governmental interests put forward to justify the regulation; (2) whether prisoners retain "alternative means of exercising the right" at issue; (3) the impact the requested accommodation will have upon inmates, prison staff and the allocation of prison resources generally; and (4) whether there are easy alternatives to the regulation which could be implemented at a minimal cost to legitimate penological interests.  *See Shaw v. Murphy*, 532 U.S. 223, 229 (2001); *Turner,* 482 U.S. at 89-91.  In evaluating a free exercise claim, courts must give "appropriate deference to prison officials," *O'Lone*, 482 U.S. at 349, because "the judiciary is 'ill-equipped' to deal with the difficult and delicate problems of prison management."  *Thornburgh v. Abbot*, 490 U.S. 401, 407-08 (1989) (citation omitted).

### a.   Kosher Diet

Plaintiff alleges that he sincerely believes he must consume kosher meat to maintain his spirituality, and that this sincere belief is rooted in his Orthodox Christian religion (#60-1, pp. 1-2; #86, p. 31).   Plaintiff claims that Genesis 9:3 and Romans 14:2 mandate that plaintiff partake in a meat-based diet (#86, p. 34), and that Acts 15:22-29 provides that Christians are to "abstain from things offered to idols, from blood, from things strangled, and from sexual immortality."   *Id.* at 7. Thus, plaintiff concludes he is required to consume kosher meat as a tenet of his Orthodox Christian religion.

Defendants contend that they are not required to provide plaintiff with a kosher diet or a kosher meat diet.   Defendants argue that plaintiff does not sincerely believe that he requires a kosher diet or kosher meat diet, and that his request is not rooted in the Orthodox Christian religion (#66, pp. 22, 26, n. 46; #75, pp. 7-8).   Defendants also argue that NDOC's former policy of providing kosher meals only to Jewish inmates is reasonably related to the legitimate penological interests of conserving scarce fiscal resources and preventing inmate envy (#66, p. 23; #75, p. 20, n.44).[10]

As a preliminary matter, the court notes that both plaintiff and defendants spent considerable time and effort arguing whether a kosher diet or kosher meat diet is a tenet, requirement or mandate of the Orthodox Christian religion.   Plaintiff contends that Acts 15:22-29 supports his claim that Orthodox Christians adhere to a kosher meat diet (#86, p. 7); whereas defendants rely on declaratory evidence from NDOC Chaplain James Stogner, who states that Orthodox Christians are not required to observe a kosher diet or kosher meat diet (#66-33, ¶¶ 34-37).   Both sides have also referred the court to out-of-circuit case law.   Plaintiff cites *Martinelli v. Dugger*, 817 F.2d 1499 (11th Cir. 1987),

---

[10] Finally, defendants argue that plaintiff's request for a kosher meat diet is unnecessary because all livestock sold for human consumption in the United States is humanely slaughtered, and the blood is drawn at the time of slaughtering. Defendants cite varying provisions of the United States Code and Code of Federal Regulations for this contention (#66, p. 22-23, n. 38; #75, p. 8).

in which the Eleventh Circuit found that the evidence supported Martinelli's claim that eating kosher meats was a Greek Orthodox religious practice. *Id.* at 1504-05. Likewise, defendants cite *Guzzi v. Thompson*, 470 F.Supp.2d 17 (D.Mass. 2007), in which the District of Massachusetts found that Guzzi's purported right to a kosher diet did not meet RLUIPA's statutory definition of "religious exercise," as Guzzi was an Orthodox Catholic—not a Jew. *Id.* at 25-26 ("While keeping kosher within the practice of various sects of Judaism constitutes a religious exercise, keeping kosher itself is not a religion.").

Although plaintiff and defendants disagree as to the appropriate religious diet for an Orthodox Christian, that is not the critical inquiry. The Ninth Circuit has found that inmates "have the right to be provided with food sufficient to sustain them in good health that satisfies the dietary laws of their religion." *Ward v. Walsh*, 1 F.3d 873, 877 (9th Cir. 1993) (citing *McElyea*, 833 F.2d at 198). However, the Ninth Circuit has also made clear that "'[i]t is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds.'" *Shakur*, 514 F.3d at 884 (citation omitted). Instead, the inquiry is "whether the [prisoner's] beliefs . . . are sincerely held and whether they are, in his own scheme of things, religious." *Seeger*, 380 U.S. at 185. Here, the dispositive inquiry is not whether the consumption of kosher food or kosher meats is a component, requirement or mandate of the Orthodox Christian faith. Rather, the only relevant inquiry is whether plaintiff sincerely believes that consuming kosher meats is a component of his Orthodox Christian faith. *See Shakur*, 514 F.3d at 885 (the plaintiff's "sincere belief that he is personally required to consume kosher meat to maintain his spirituality," although admittedly not required by his Muslim faith, was sufficient to determine that the prison's refusal to provide him with a kosher meat diet implicated the Free

1  Exercise Clause); *Thomas v. Review Bd. of Indiana Employment Security Sec. Division*, 450 U.S.

2  707, 716 (1981) ("[c]ourts are not arbiters of scriptural interpretation").

3       The court has thoroughly reviewed the record, and concludes that plaintiff cannot show that

4  his alleged need for a kosher meat diet is based on a "sincerely held" religious belief (*see* plaintiff's

5  deposition, #66-1, pp. 25-34). Plaintiff testified that an Orthodox Christian's religious diet is not as

6  strict as an Orthodox Jew's kosher diet. *See* #66-1, p. 109 (in Orthodox Christianity "[i]t's just the

7  meats that have to be kosher").[11] Plaintiff also testified that the Orthodox Christian religion requires

8  its adherents to "abstain from blood and to abstain from things strangled, things offered to idols" and

9  opined that "the only way that that can be guaranteed is through [kosher] certification." *Id.* at 107.

10  However, plaintiff could not articulate why he believed kosher certification was necessary to

11  "abstain from blood" and "abstain from things strangled," nor could plaintiff point to any religious

12  source suggesting that Jewish kosher certifications comport with Orthodox Christian dietary tenets.

13  *Id.* at 113-114. Plaintiff did not know which kosher certifying agencies his religion would accept,

14  did not know how kosher meat was prepared, and he stated that his knowledge of kosher dietary

15  requirements came from "case law." *Id.* at 106-107, 120-121. Plaintiff simply articulated his

16  unfounded belief that if kosher meat comports with the Jewish inmates' dietary requirements, then it

17  should satisfy the Orthodox Christian inmates' dietary requirements.[12] *Id.* at 118-19.

---

[11] The court refers to the pagination in plaintiff's deposition transcript.

[12] Plaintiff alleges that *Martinelli v. Dugger*, 817 F.2d 1499 (11th Cir. 1987), supports his claim that Orthodox Christian inmates are entitled to receive Jewish kosher meals. In *Martinelli*, the plaintiff was a Greek Orthodox inmate and claimed that he required a religious diet consisting of: fresh fruits, fresh vegetables, eggs, milk, cheese, peanut butter, jelly, fruit juices, cereals, appropriate meats, and/or a full kosher diet. 817 F.2d at 1501. The Magistrate Judge found that Martinelli had a sincere and deeply-rooted religious conviction that he should not eat pork, but found that the prison did not have to provide Martinelli with a full kosher diet. *Id.* at 1502. The district court also refused to order the prison to provide Martinelli with his requested food items or a full kosher diet. *Id.* at 1503. The Eleventh Circuit noted that the prison had conceded that Martinelli had a sincere belief that he should eat kosher meats, and found that Martinelli's assertion that he should eat kosher meats as part of his Greek Orthodox religious practice was supported by the evidence. *Id.* at 1504-05. However, the court refused to order the prison to provide Martinelli with a kosher diet, as the prison's dietary rules were rationally related to its legitimate interest in avoiding cost overruns. *Id.* at 1507, n. 29. This court notes that whether *plaintiff* has a "sincerely held" belief that he should adhere to a kosher diet as part of his Orthodox

-19-

When plaintiff was asked if his religious dietary requirements would be satisfied if the prison's food supplier certified that the animals were slaughtered and not strangled, plaintiff replied, "I don't believe so" because he would not trust that the food supplier was not acting in collusion with the prison. *Id.* at 115-117. When plaintiff was asked if he ever bought non-kosher meat products from the canteen, plaintiff replied, "not knowingly," then stated that he may have eaten non-kosher meat offered by another inmate. *Id.* at 132. Finally, on October 14, 2012, plaintiff asked to be removed from the alternative meatless diet, and to be placed back on the mainline-menu diet, which contains non-kosher meat products (#75-2, p. 4).

The court cannot find that plaintiff's "proffered belief [was] sincerely held." *See Callahan*, 658 F.2d at 683; *McElyea*, 833 F.2d at 198 (prison authorities may deny special religious diet if inmate is not sincere in his religious beliefs). Plaintiff has failed to set forth any evidence to support his claim that he sincerely believes he is required to observe a kosher diet or kosher meat diet to maintain his Orthodox Christian spirituality. The mere fact that on October 14, 2012, plaintiff asked to be returned to the mainline-menu diet, which contains non-kosher meat, militates against plaintiff's claim. Plaintiff has also failed to set forth any evidence that LCC's kosher diet offerings would actually satisfy his Orthodox Christian dietary requirements. The lack of such evidence not only undermines plaintiff's assertion that a kosher diet or kosher meat diet is a tenant of Orthodox Christianity, but also indicates to the court that plaintiff is not espousing a sincerely held religious belief. Accordingly, the court finds that LCC's refusal to provide plaintiff with a kosher diet or kosher meat diet does not implicate First Amendment free exercise protections.

However, even assuming *arguendo* that the Free Exercise Clause is implicated, defendants' actions are nevertheless "reasonably related to legitimate penological interests." *Turner*, 482 U.S. at

---

Christian religious practice is a case-specific determination. Therefore, *Martinelli* does not add to the court's analysis.

89.   In determining whether a prison's culinary policy is reasonable, the court must balance the degree of intrusiveness into the plaintiff's free exercise right against the costs of accommodation, giving appropriate deference to prison officials' assessment.  *Ward*, 1 F.3d at 877.

Under the first *Turner* factor, the court must determine whether there is a valid, rational connection between the disputed regulation and the legitimate penological interest used to justify the regulation.  *See Turner*, 482 U.S. at 89-90 ("[A] regulation cannot be sustained where the logical connection . . . is so remote as to render the policy arbitrary or irrational.").  Here, the court finds that there is a rational connection between LCC's policy of denying kosher meals to inmates whose religions are not perceived to require them (such as Orthodox Christian inmates) and the prison's legitimate interests.  The prison has a legitimate interest in conserving scarce fiscal resources, in preventing inmate-bartering of kosher food for safety and health reasons, and in preventing inmate-envy to decrease the risk of violence and threats upon those inmates or staff (#66-35, ¶ 11).[13]  The court finds that the first *Turner* factor weighs defendants' favor.  *See Shakur*, 514 F.3d at 886 ("Although the marginal cost and administrative burden of adding Shakur to the roster of kosher-diet inmates would be small or even negligible, we cannot conclude that no rational nexus exists between [the prison's] dietary policies and its legitimate administrative and budgetary concerns.  [The prison] could rationally conclude that denying Muslim prisoners kosher meals would simplify its food service and reduce expenditures.").

The second *Turner* factor requires the court to consider whether plaintiff has "alternative means by which he can practice his religion" or is "denied all means of religious expression." *Shakur*, 514 F.3d at 886.  The relevant inquiry is not whether the inmate has an alternative means to

---

[13] In *Ward v. Walsh*, 1 F.3d 873, 878 (9th Cir. 1993), the Ninth Circuit discounted the favoritism argument, since this effect "is present in every case that requires special accommodations for adherents to particular religious practices. While not irrelevant, it is not in itself dispositive."  However, the court believes that avoiding the appearance of favoritism should be considered along with LCC's other asserted legitimate interests.

engage in the particular religious practice that he claims is being restricted; rather, the inquiry is whether the inmate has been denied all means of religious expression.  *O'Lone*, 482 U.S. at 351-52. Further, where "other avenues" remain available for the plaintiff to exercise his religious rights, courts should be particularly conscious of the deference owed to prison administrators.  *Turner*, 482 U.S. at 90.

Here, the court finds that LCC provides plaintiff with alternative means by which he can practice his religion.  As far as plaintiff's diet is concerned, plaintiff may participate in LCC's alternative meatless diet and supplement that diet with kosher meat products from the canteen.  As far as plaintiff's general ability to practice his Orthodox Christian religion is concerned, the record reflects that plaintiff may keep religious observances in his cell, may request a time-slot for Orthodox Christian group worship in the chapel schedule, may request clergy visits, may attend religious group services, may obtain approved religious print materials, and may borrow books and other materials from the chapel library (#66-33, ¶¶ 61, 68-70).

The evidence in the record indicates that plaintiff, as an Orthodox Christian inmate, has the opportunity to participate in significant aspects of his religion and is not being denied all means of religious expression.  *See O'Lone*, 482 U.S. at 351-52; *Williams v. Morton*, 343 F.3d 212, 219 (3rd Cir. 2003) (finding that the second *Turner* factor is satisfied if the prison allows daily prayer, attendance at special weekly services and observance of religious holidays, even if inmates could eat vegetarian meals but not Halal meat).  The second *Turner* factor also weighs in defendants' favor.

The third *Turner* factor requires the court to consider the "impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally."  *Turner*, 482 U.S. at 90.  The Supreme Court explained this factor as follows: "When the accommodation of an asserted right will have a significant 'ripple effect' on fellow

inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officers." *Id*. (citation omitted). This court is aware that prison administration is an "inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government." *Resnick v. Adams*, 348 F.3d 763, 770-71 (9th Cir. 2003).

Defendants have submitted evidence from NDOC's Chief of Purchasing, Dawn A. Rosenberg. Ms. Rosenberg states that from calendar year 2009 to calendar year 2012, kosher meals cost six to seven times more than non-kosher, mainline-menu meals (#66-34, ¶ 9). If LCC were forced to provide kosher meals to an increasingly large number of inmates, the institution would clearly experience a financial burden that would affect "the allocation of prison resources, generally." *Turner*, 482 U.S. at 90. Here, however, the evidence indicates that there are only three or four Orthodox Christian inmates incarcerated at LCC, and there is no indication whether these other inmates would request a kosher diet. As such, defendants have not provided the court with any evidence to support their assertion that providing plaintiff with a kosher diet would result in more than a *de minimis* impact on LCC's financial operations.

However, defendants have also submitted the declaration of LCC Warden Robert LeGrand, who states that if LCC were forced to provide kosher meals to inmates with no legal right to receive kosher meals, the prison could experience other problems. For example, inmates may hide the sealed kosher food containers on their persons and transport these containers back to their cells, which could promote inmate-bartering or improper food storage—both prohibited for safety, security and health reasons (#66-35, ¶ 11). Warden LeGrand also states that inmate-envy issues may arise, which could lead to an increased risk of violence and threats towards the "favored" inmates or prison staff. *Id.* Because an exception for plaintiff may place burdens on prison resources with respect to

safety and security, the court finds this factor weighs slightly in defendants' favor.  *See Henderson v. Terhune*, 379 F.3d 709, 714 (9th Cir. 2004).

The fourth *Turner* factor requires the court to consider whether "there are ready alternatives to the prison's current policy that would accommodate [plaintiff] at *de minimus* cost to the prison." *Shakur*, 514 F.3d at 887.  "[T]he absence of ready alternatives is evidence of the reasonableness of a prison regulation," *Washington v. Harper*, 494 U.S. 210, 225 (1990), while the existence of easy alternatives may be "evidence that the [policy] is not reasonable but is an 'exaggerated response' to prison concerns." *Turner*, 482 U.S. at 90-91.  The burden of identifying a ready alternative is on the plaintiff.  *O'Lone*, 482 U.S. at 350; *Turner*, 482 U.S. at 90-91 (defendants need not "set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint.") (citation omitted).

Plaintiff argues that LCC could accommodate his religious dietary request by simply providing him with the standard kosher diet already enjoyed by Jewish inmates, instead of a special kosher meat diet.  Defendants argue that there are no ready alternatives to LCC's kosher diet policy from the perspective that scarce resources are either conserved or they are not (#66, p. 23, n. 39).  As previously stated, the court cannot determine whether providing plaintiff with a kosher diet would place more than a *de minimis* financial burden on LCC.  However, it appears that LCC's refusal to provide plaintiff with a kosher diet is justified by safety, security and health concerns.  Accordingly, the court finds that the fourth *Turner* factor weighs in defendants' favor.  *See Resnick v. Adams*, 348 F.3d 763, 771 (9th Cir. 2003) (quoting *Turner v. Safely*, U.S. 482 at 85) ("When it comes to judicial review of prison regulations, 'separation of powers concerns counsel a policy of judicial restraint.'").

Balancing these factors, the court finds that LCC's culinary policy regarding kosher meals is reasonably related to the prison's legitimate penological interests.  Because plaintiff does not present

any factual issues concerning the reasonableness of the restriction, the court recommends summary judgment be granted in favor of defendants on plaintiff's First Amendment religious diet claim.

### b.  Corporate Prayer

Plaintiff alleges that he sincerely believes he must engage in corporate prayer to practice his Orthodox Christian religion (#86, p. 31), and that defendants' "total ban" on his ability to engage in corporate prayer is not justified by any legitimate or compelling penological interest (#86, p. 14). Plaintiff contends that the upper room in Housing Unit 3B could easily accommodate plaintiff's needs without additional supervision or staffing (#14, p. 18).

Defendants argue that plaintiff has requested corporate prayer seven times a day, and that this request is not rooted in the Orthodox Christian religion (#66, p. 23).  Defendants also argue that there is a rational connection between LCC's policy of providing group services to as many inmates as practicable and denying plaintiff (and possibly one other inmate) access to the Chapel or Unit 3B activity room seven times per day.  *Id.* at 23, n. 40.

As a preliminary matter, the court notes that plaintiff attempts to characterize defendants' rejection of plaintiff's request for group meeting space as a "total ban" on Orthodox Christian corporate prayer.  This characterization is misleading.  On August 1, 2010, plaintiff submitted an inmate kite requesting group prayer seven times per day at specified hours (Daily Matins, 1st Hour— 6 a.m., 3rd Hour—9 a.m., 6th Hour—noon, 9th Hour—3 p.m., Vespers—6 p.m., Small Compline—9 p.m., and midnight) (#66-36, p. 78).  Chaplain Garcia rejected plaintiff's request on the grounds that securing a group meeting space (other than plaintiff's cell) for seven meetings a day was unfeasible in the prison environment.  *Id.*  On September 8, 2010, plaintiff submitted Grievance Log No. 2006-29-04879, complaining that Chaplain Garcia and defendant Carpenter denied his request for "the seven liturgical hours of prayer as required by the Orthodox religion."  *Id.* at 67.  Accordingly,

defendants' denial of plaintiff's corporate prayer request cannot be characterized as a "total ban" on Orthodox Christian group worship.  Instead, the denial was simply a denial of plaintiff's request to set aside meeting space for Orthodox Christian group worship *seven times per day at specified hours*.  Accordingly, the issue here is not whether plaintiff has a constitutional right to engage in corporate prayer, but whether plaintiff can command group worship space seven times a day at specified hours as a matter of right.

Plaintiff alleges that because corporate prayer is referenced in religious texts and because there are seven liturgical hours in a day, engaging in corporate prayer at the seven liturgical hours is required by plaintiff's Orthodox Christian religion.  The evidence before the court is insufficient for the court to say, with certainty, whether plaintiff sincerely believes he must participate in corporate prayer seven times per day at the specified liturgical hours of prayer in order to practice his Orthodox Christian religion.  However, the court can say, with certainty, that *Turner* permits LCC to encroach on any constitutional right implicated here.

As noted previously, under the first *Turner* factor, the court must determine whether there is a valid, rational connection between the disputed regulation and the legitimate penological interest used to justify the regulation.  *See Turner*, 482 U.S. at 89.  Here, the court finds that there is a rational connection between LCC's denial of plaintiff's request for group meeting space seven times a day and the prison's legitimate interests.  The prison has a legitimate interest in maintaining prison safety, security, discipline and order, in conserving scarce resources, and in using the activity rooms and chapel to benefit the greatest number of inmates practicable (#66-35, ¶¶ 14, 19, 32).  The first *Turner* factor favors defendants.

As for the second *Turner* factor, the court finds that the mere fact that LCC prison officials denied plaintiff's request to set aside meeting space for Orthodox Christian group worship seven

times per day did not deny plaintiff "all means of religious expression."  *Shakur*, 514 F.3d at 886.

Plaintiff certainly has alternative means by which he can practice his religion.  For example, plaintiff

may practice his faith privately seven times a day, request a time-slot for Orthodox Christian group

worship in the chapel schedule, request clergy visits, attend religious group services with other

Christians, obtain approved religious print materials, and borrow books and other materials from the

chapel library (#66-33, ¶¶ 22, 61, 68-70).  In fact, plaintiff testified that he attends Christian group

worship services once or twice a week (#66-1, p. 83).  Plaintiff is simply precluded from

commandeering a space for Orthodox Christian group worship seven times a day at specified times.

The second *Turner* factor favors defendants.

Under the third *Turner* factor, the court considers the "impact accommodation of the asserted

constitutional right will have on guards and other inmates, and on the allocation of prison resources

generally."  *Turner*, 482 U.S. at 90.  Plaintiff requests group meeting space in Housing Unit 3B's

activity room(s).  However, plaintiff has not provided the court with evidence of the activity room's

current usage or evidence of the security requirements surrounding plaintiff's request to use the

activity room.  Warden LeGrand states that LCC schedules Housing Unit 3B's activity room to

benefit the greatest number of inmates practicable, and that this space is already being used for

educational classes, college classes, self-help courses, the barber shop and the laundry pass-out area

(#66-35, ¶¶ 32, 25).  If LCC permitted plaintiff's religious group to use the Unit 3B activity room

forty-nine times per week, as plaintiff requests, LCC would be forced to cease using this area for

other scheduled activities.  *Id.* at ¶¶ 26-27.  Warden LeGrand opines that if LCC granted plaintiff's

request, other inmates could resent the fact that their education, mental health, self-help, haircuts and

other programs were adversely affected, which could increase the risk of harm to both plaintiff and

staff.  *Id.* at ¶ 29.  Warden LeGrand also states that LCC operates with reduced staff in the evening

hours, and there are many nights where there is no floor-officer in the PS unit.  *Id.* at ¶ 30.  If LCC were to accommodate plaintiff's request for group prayer in the evening, LCC would be forced to pull staff from other critical areas or hire overtime staff to safely supervise these activities.  *Id.* at ¶ 31.  Finally, plaintiff testified that there is only one other Orthodox Christian inmate in his housing unit (#66-1, pp. 80-81, 91-92, 167-70).  Since inmates from PS are not permitted to mix with inmates in GP, plaintiff's Orthodox Christian faith group has a current population of two inmates.  Thus, plaintiff's faith group rightfully ranks lower on the meeting space allocation hierarchy.

The record reflects that accommodating plaintiff's request for Orthodox Christian group worship meeting space seven times per day will adversely affect other inmates, staff, and the allocation of prison resources generally.  Accordingly, the third *Turner* factor favors defendants.

The fourth *Turner* factor requires the court to consider whether "there are ready alternatives to the prison's current policy that would accommodate [plaintiff] at *de minimus* cost to the prison." *Shakur*, 514 F.3d at 887.  Here, there are no ready alternatives that would accommodate plaintiff's specific request for corporate prayer seven times per day at a *de minimus* cost to LCC.  The prison simply cannot be expected to provide plaintiff's religious group with a meeting space every day at 6 a.m., 9 a.m., noon, 3 p.m., 6 p.m., 9 p.m. and midnight.  The fourth *Turner* factor favors defendants.

Balancing these factors, the court finds that LCC's denial of plaintiff's request for Orthodox Christian corporate prayer meeting space seven times per day at specified hours is reasonably related to the prison's legitimate penological interests.  Because plaintiff does not present any factual issues concerning the reasonableness of LCC's denial, the court recommends that summary judgment be granted in defendants' favor on plaintiff's First Amendment corporate prayer claim.

## 2. RLUIPA

Plaintiff alleges that defendants' refusal to officially recognize his Orthodox Christian religion places a substantial burden on his religious exercise because it prevents plaintiff from receiving a kosher meat diet and participating in corporate prayer (#60, p. 19). Defendants contend that they did not violate plaintiff's religious rights under RLUIPA on these grounds: (1) for an Orthodox Christian, observing a kosher diet does not constitute a substantial burden and does not meet RLUIPA's statutory definition of "religious exercise" (#66, pp. 12-14, 26 n. 46); (2) denying plaintiff's request for a corporate prayer meeting space seven times a day does not constitute a substantial burden on plaintiff's religious exercise (#66, p. 26); and (3) even if denying plaintiff's request for a corporate prayer meeting space did constitute a substantial burden on plaintiff's religious exercise, defendants have demonstrated a compelling governmental interest in preventing plaintiff from interrupting the services provided to other inmates seven times per day. *Id.* at 26-27.

The Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc *et seq.*, provides in relevant part:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person: (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a). Thus, RLUIPA mandates a stricter standard of review for prison regulations that burden the free exercise of religion than the reasonableness standard articulated in *Turner*. *Greene v. Solano County Jail*, 513 F.3d 982, 986 (9th Cir. 2008) (citations omitted).

To establish a RLUIPA violation, the plaintiff bears the initial burden of proving that the defendants' conduct imposed a "substantial burden" on his "religious exercise."

*Warsoldier v. Woodford*, 418 F.3d 989, 994 (9th Cir. 2005).  Once the plaintiff establishes a substantial burden on his religious exercise, defendants must prove that the burden both furthers a compelling governmental interest and is the least restrictive means of achieving that interest.  *Id.* at 995.  The Ninth Circuit has set out four factors for the RLUIPA analysis: (1) what "exercise of religion" is at issue; (2) what "burden," if any, is imposed on that exercise of religion; (3) if there is a burden, whether it is "substantial;" and (4) if there is a "substantial burden," whether it is justified by a compelling governmental interest and is the least restrictive means of furthering that compelling interest.  *Navajo Nation v. U.S. Forest Serv.*, 479 F.3d 1024, 1033 (9th Cir. 2007), *aff'd en banc*, 535 F.3d 1058, 1068 (9th Cir. 2008).

Although RLUIPA does not define what constitutes a "substantial burden" on religious exercise, the burden must be more than a mere inconvenience.  *Navajo Nation*, 479 F.3d at 1033 (internal quotations and citations omitted).  The Ninth Circuit has stated that a substantial burden is one that is "'oppressive' to a 'significantly great' extent."  "That is, a 'substantial burden' on 'religious exercise' must impose a significantly great restriction or onus upon such exercise."  *Warsoldier*, 418 F.3d at 995 (quoting *San Jose Christian Coll. v. City of Morgan Hill*, 360 F.3d 1024, 1034 (9th Cir. 2004)).  The burden must prevent the plaintiff "from engaging in [religious] conduct or having a religious experience."  *See Navajo Nation*, 479 F.3d at 1033 (internal citations omitted).  In addition, a substantial burden exists when the state, "denies [an important benefit] because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs."  *Shakur v. Schriro*, 514 F.3d 878, 888 (9th Cir. 2008) (quoting *Thomas v. Review Bd. of the Ind. Employment Sec. Div.*, 450 U.S. 707, 717-18 (1981) (internal quotations omitted)).

RLUIPA defines "religious exercise" as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief."  42 U.S.C. § 2000cc-5(7)(A).  Although RLUIPA "bars inquiry into whether a particular belief or practice is 'central' to a prisoner's religion . . . the Act does not preclude inquiry into the sincerity of a prisoner's professed religiosity."  *Cutter v. Wilkenson*, 544 U.S. 706, 725 n.13 (2005).

Here, the court finds that there is no evidence to indicate that defendants' refusal to provide plaintiff with a kosher diet and group meeting space for corporate prayer seven times per day places a "substantial burden" on plaintiff's religious exercise.

The Seventh Circuit has found that "a prisoner's religious dietary practice is substantially burdened when the prison forces him to choose between his religious practice and adequate nutrition."  *Nelson v. Miller*, 570 F.3d 868, 869 (7th Cir. 2009).  As stated above, the court finds that plaintiff's assertion that he requires a kosher diet to satisfy his Orthodox Christian religious needs is not a sincerely held religious belief.  Although plaintiff credibly testified that the Orthodox Christian religion requires its adherents to "abstain from blood and to abstain from things strangled," plaintiff could not explain why kosher certification was necessary to meet these requirements (#66-1, p. 107).  In addition, on October 14, 2012, plaintiff asked to be removed from the alternative meatless diet, and to be placed back on the mainline-menu diet, which contains non-kosher meat products (#75-2, p. 4).  Plaintiff states that this change has allowed him to trade his non-kosher meat for fresh fruit and vegetables (#96, p. 21).  It appears that plaintiff has worked out an acceptable diet that comports with his religion and is not forced "to choose between his religious practice and adequate nutrition."  *Nelson*, 570 F.3d at 869.  Accordingly, the court finds that LCC's refusal to provide plaintiff with a kosher diet or kosher meat diet does not violate plaintiff's statutory rights under RLUIPA.

Likewise, LCC's refusal to provide plaintiff with a group meeting space for corporate prayer

seven times per day (forty-nine times per week) does not place a "substantial burden" on plaintiff's religious exercise.  Unlike *Greene*, where there was an "outright ban" on the plaintiff's chosen religious exercise, here, Chaplain Garcia and defendant Carpenter did not place a total ban on Orthodox Christian group worship.  They merely denied plaintiff's request to commandeer group meeting space seven times per day.  Plaintiff has ample opportunity to pursue his faith in other ways. Plaintiff may practice his faith privately seven times per day, request a time-slot for group worship in the Chapel schedule, request clergy visits, attend religious group services with other Christians, and borrow books and other religious materials from the chapel library (#66-33, ¶¶ 22, 61, 68-70). Accordingly, plaintiff has failed to make a showing that the denial of his corporate prayer request amounts to a substantial burden on his religious exercise.

Plaintiff has failed to prove that defendants' refusal to provide him with a kosher diet and group meeting space for corporate prayer seven times a day prevents him from "engaging in religious conduct or having a religious experience." *Navajo Nation*, 535 F.3d at 1091.  Accordingly, the court recommends that summary judgment be granted in defendants' favor on plaintiff's RLUIPA claims.[14]

### 3.   Fourteenth Amendment Equal Protection

Plaintiff alleges that defendants violated his Fourteenth Amendment right to equal protection when they denied plaintiff's requests for a kosher diet and corporate prayer (#86, p. 18).  Plaintiff argues that NDOC's practice of providing kosher meals only to Jewish inmates is an improper race-based policy (#60, p. 22; #75-4, p. 10).  Plaintiff further argues that defendants' refusal to provide plaintiff with a kosher diet constitutes "palpable discrimination," especially since LCC

---

[14] Defendants are also entitled to summary judgment on plaintiff's RLUIPA claim for monetary damages because plaintiff cannot recover monetary damages against defendants sued in their individual or official capacities.  *See Mauwee v. Donat*, 2009 WL 3062787, at *6 (D.Nev. Sept. 18, 2009) (citing *Rendelman v. Rouse*, 569 F.3d 182, 184 (4th Cir. 2009)).

accommodates Jewish inmates in their kosher diet, Muslim inmates in their Ramadan fast, and Roman Catholic inmates during Lent (#96, p. 29).

Defendants contend that NDOC's prior kosher diet policy is not race-based, as the policy included those inmates who converted to Judaism—without regard to their ancestral ethnicity, heritage or race (#66, pp. 24-25).  Defendants also contend that Orthodox Christian and Jewish inmates are dissimilar with respect to their religious dietary requirements, such that they cannot be compared in an unlawful discrimination analysis (#75, p. 11).  Finally, defendants contend that LCC schedules group meeting space with secular goals in mind—not with an intent to favor one religious group over another.  *Id.* at 24.

The Equal Protection Clause of the Fourteenth Amendment requires the State to treat all similarly situated people equally.  *See City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985).   Under the Equal Protection Clause, prisoners are protected from invidious discrimination based on race, *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974), and religion.  *See Freeman v. Arpaio*, 125 F.3d 732, 737 (9th Cir. 1997), *abrogated on other grounds by Shakur*, 514 F.3d at 884-85.  To establish a violation of the Equal Protection Clause, a plaintiff must show that prison officials intentionally discriminated against him on the basis of his religion by failing to provide him with a reasonable opportunity to pursue his faith compared to other similarly situated religious groups.  *Cruz v. Beto*, 405 U.S. 319, 321-22 (1972); *Shakur*, 514 F.3d at 891; *Serrano v. Francis*, 345 F.3d 1071, 1082 (9th Cir. 2003), *cert. denied*, 543 U.S. 825 (2004).  Once the plaintiff makes this prima facie showing, the court must apply the *Turner* factors.  *See Shakur*, 514 F.3d at 891; *see also Walker v. Gomez*, 370 F.3d 969, 974 (9th Cir. 2004) (citations omitted) ("In the prison context, however, even fundamental rights such as the right to equal protection are judged by a

standard of reasonableness—specifically, whether the actions of prison officials are 'reasonably related to legitimate penological interests.'").

To defeat defendants' motion for summary judgment, plaintiff must first set forth specific facts showing that there is a genuine issue as to whether he was afforded a reasonable opportunity to pursue his faith as compared to prisoners of other faiths, and that "officials intentionally acted in a discriminatory manner." *Freeman*, 125 F.3d at 737. "Intentional discrimination means that a defendant acted at least in part because of a plaintiff's protected status." *Maynard v. City of San Jose*, 37 F.3d 1396, 1404 (9th Cir. 1994).

Plaintiff has failed to proffer any evidence showing that defendants intentionally discriminated against him based on either his race or religion. Plaintiff's allegation that defendants allow plaintiff, Jewish inmates and Muslim inmates to engage in different practices does not evidence discriminatory intent, as defendants are only required to ensure that members of different faith groups receive an equal opportunity to pursue their faith—not identical practices. In *Cruz v. Beto*, the Supreme Court confirmed that not every religious group within a prison need have identical facilities or personnel. 405 U.S. at 322 n. 2. Instead, prisons must make "good faith accommodation of the [prisoner's] rights in light of practical considerations." *Allen v. Toombs*, 827 F.2d 563, 569 (9th Cir. 1987) (citation omitted). LCC officials do not need to duplicate every religious benefit provided so that all religions are treated exactly the same.

There is nothing in the record, other than plaintiff's bare allegations, that would tend to prove that LCC's kosher meal policy was implemented with an intent to discriminate against the Orthodox Christian population. There is also nothing in the record that would tend to prove that LCC denied plaintiff's request for corporate prayer meeting space seven times a day with an intent to discriminate against the Orthodox Christian population. Having failed to make out a prima facie

case of intentional discrimination, plaintiff is not entitled to prevail upon his Fourteenth Amendment equal protection claims.[15]

### III.  CONCLUSION

Based on the foregoing and for good cause appearing, the court concludes that defendants are entitled to summary judgment in their favor, as there are no genuine issues of material fact for trial. The parties are advised:

1.      Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule IB 3-2 of the Local Rules of Practice, the parties may file specific written objections to this Report and Recommendation within fourteen days of receipt.  These objections should be entitled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the District Court.

2.      This Report and Recommendation is not an appealable order and any notice of appeal pursuant to Fed. R. App. P. 4(a)(1) should not be filed until entry of the District Court's judgment.

### IV.      RECOMMENDATION

**IT IS THEREFORE RECOMMENDED** that plaintiff's motion for summary judgment (#60) be **DENIED** and defendants' cross-motion for summary judgment (#66) be **GRANTED**.

**DATED:** July 10, 2013.

_____
**UNITED STATES MAGISTRATE JUDGE**

---

[15] Because the court recommends that summary judgment be granted in defendants' favor, the court will not address defendants' personal participation, supervisory liability or qualified immunity defenses.

-35-